# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 19, 2010

No. 09-60312

Lyle W. Cayce
Clerk

HARDY WILSON MEMORIAL HOSPITAL; SHARKEY-ISSAQUENA COMMUNITY HOSPITAL; ALLIANCE HEALTHCARE SYSTEMS INC; JEFFERSON COUNTY HOSPITAL; CLAIBORNE COUNTY HOSPITAL,

Plaintiffs-Appellants

v.

KATHLEEN SEBELIUS, SECRETARY, DEPARTMENT OF HEALTH & HUMAN SERVICES, In her official capacity as Secretary of the United States Department of Health and Human Services; CHARLENE FRIZZERA, In her official capacity as Acting Administrator of the Centers for Medicare and Medicaid Services,

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Mississippi

Before SMITH, GARZA, and CLEMENT, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Appellants, five acute-care hospitals ("Providers"), sued the Secretary of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), alleging that CMS's method for calculating reimbursement payments for costs incurred by Providers' psychiatric units between 2003 and 2005 violated 42 U.S.C. § 1395ww(b)(3)(A) and was inconsistent with the agency's own regulations.  The district court granted CMS's motion for summary judgment, holding that the agency's interpretation

of the governing statutory and regulatory provisions was reasonable. For the reasons set forth below, we REVERSE and REMAND.

## I

A brief review of the regulatory scheme governing Medicare reimbursements for Providers is necessary to understand the parties' dispute. Hospitals participating in Medicare are typically compensated pursuant to the Prospective Payment System ("PPS"), whereby they receive a fixed amount for services rendered to each patient. However, psychiatric units within acute-care hospitals, such as Providers, were excluded from the PPS regime and paid pursuant to a reimbursement program enacted in the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") § 101, 42 U.S.C. § 1395ww.

TEFRA reimbursements were determined through a two-step process. First, a "target amount" was calculated for each hospital. During a hospital's first year under the system, the target amount consisted of "the allowable operating costs of inpatient hospital services . . . for the preceding 12-month cost reporting period." 42 U.S.C. § 1395ww(b)(3)(A)(i). In subsequent years, the target amount from the previous year was updated by the applicable percentage increase specified by the statute. 42 U.S.C. § 1395ww(b)(3)(A)(ii). After determining the target amount for a particular year, a reimbursement ceiling was calculated by multiplying the target amount for a hospital by the number of discharges from that hospital in the same year. *See* 42 C.F.R. § 413.40(a)(3). Reimbursements could not exceed the ceiling. CMS issued regulations implementing TEFRA's scheme of calculating the "target amount" in a base year and updating it in subsequent years. *See* 42 C.F.R. § 413.40(c)(4)(i)–(ii). TriSpan Health Services ("TriSpan"), one of CMS's fiscal intermediaries, calculated Providers' reimbursements pursuant to 42 C.F.R. § 413.40(c)(4)(ii), which set each hospital's target amount equal to the previous year's target amount increased by a statutory update factor.

In the Balanced Budget Act of 1997 ("BBA"), Congress enacted additional limits on reimbursement payments, including those for the psychiatric units in Providers' hospitals. *See* 42 U.S.C. § 1395ww(b)(3)(H). For fiscal years ("FY") 1998 through 2002, the target amounts for those hospitals could not exceed the 75th percentile of target amounts for all hospitals in the same class of providers. *See id.* Much like TEFRA, the BBA provided that this capped amount must be multiplied by update factors prescribed as part of the cap scheme for each year of the five-year period. 42 U.S.C. § 1395ww(b)(3)(H)(i).

CMS promulgated regulations implementing the BBA cap scheme. *See* 42 C.F.R. § 413.40(c)(4)(iii). The cap regulation specified the calculation of a "hospital-specific target amount," defined as the "net allowable costs in a base period increased by the applicable update factors" for the subject period. 42 C.F.R. § 413.40(c)(4)(iii)(A). That amount was then to be compared to the 75th percentile of the target amount for hospitals in the same class. 42 C.F.R. § 413.40(c)(4)(iii)(B). The final target amount for reimbursement "is the lower of the amounts specified" in subsections (c)(4)(iii)(A) and (B). For the Providers in this case, the capped amount was the lesser of the two figures and thus, the BBA provisions resulted in significantly lower reimbursements.

In 1999, Congress enacted the Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act ("BBRA"), further refining the reimbursement rules for Providers. Congress directed CMS, beginning at the end of the cap period in FY 2003, to make "payments for inpatient hospital services furnished by psychiatric hospitals or units . . . in accordance with the prospective payment system." Pub. L. No. 106-113, 113 Stat. 1501 (1999). However, CMS did not implement Congress's directive until 2005. Thus, during the period from the expiration of the BBA cap provisions in 2002 until 2005, CMS had to determine how to calculate target amounts under the existing statutory and regulatory framework.

In 2003, after the BBA cap provisions expired, Providers submitted their reimbursement requests to TriSpan on the basis of the hospital-specific target amounts under 42 C.F.R. § 413.40(c)(4)(iii)(A). TriSpan rejected those figures, and based on CMS's directives, calculated reimbursements pursuant to 42 C.F.R. § 413.40(c)(4)(ii), using the target amount actually applied to each Provider in the previous year, that is, a capped amount. Providers dispute this calculation, arguing that by basing their FY 2003 target amounts on the FY 2002 capped amount, CMS has impermissibly extended the impact of the BBA cap provisions beyond their 2002 expiration date.

Providers appealed TriSpan's calculation to the Provider Reimbursement Review Board, which granted expedited judicial review because resolution of the claim required a decision on the legality of CMS's regulations. In the district court, Providers argued that their reimbursements in 2003, 2004, and 2005 should have been calculated using an uncapped hospital-specific target amount based on reasonable cost. CMS argued that under 42 U.S.C. § 1395ww(b)(3)(A)(ii) and 42 C.F.R. § 413.40(c)(4)(ii), the reimbursable target amount in subsequent years must be based on the previous year's amount, even if that amount resulted from BBA caps. The difference in the reimbursement methods is illustrated as follows:

| Fiscal Year | Hospital-Specific Target Amount | 75th Percentile Capped Amount Under the BBA | Final Target Amount Actually Reimbursed |
|---|---|---|---|
| 1997 | $25,330.72 | n/a | $25,330.72 |
| 1998 | $25,330.72 | $10,534.00 | $10,534.00 |
| 1999 | $25,337.58 | $10,787.00 | $10,787.00 |
| 2000 | $25,507.64 | $8,870.71 | $8,870.71 |
| 2001 | $25,752.51 | $9,323.93 | $9,323.93 |
| 2002 | $25,958.53 | $9,696.35 | $9,696.35 |
| 2003 | $26,867.08 | n/a | $10,035.72 |

Providers believe that their 2003 target amount should be $26,867.08, which is derived by applying the statutory update factor to the 2002 "hospital-specific target amount" of $25,958.53. In other words, Providers argue that the "target amount" was always equal to the hospital-specific allowable costs from the base year as adjusted to the current year. CMS, on the other hand, contends that the proper reimbursement in 2003 is $10,035.72, derived by applying the statutory update factor to the previous year's final target amount of $9,696.35 actually paid to the Providers under the 75th percentile cap. Thus, according to CMS, the capped amount becomes a hospital's "target amount" for purposes of calculating its subsequent year's reimbursement.

The district court granted CMS's motion for summary judgment, concluding that the agency's method for calculating target amounts for psychiatric hospitals and units was consistent with the governing statutes and regulations. Applying the two-step test articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the district court first concluded that the statute was ambiguous. It then concluded that the method CMS used to calculate reimbursement payments between 2003 and 2005 was permissible. The court also rejected Providers' argument that 42 C.F.R. §413.40(c)(4)(iii) compelled CMS to calculate Providers' target amount based on the hospital-specific target amount, rather than the actual target amount applied in the previous year, *i.e.*, a capped amount.

Providers appeal, claiming that the court erred in (1) finding CMS's method for calculating reimbursements permissible under the governing statutes and (2) finding CMS's calculations consistent with its own regulations.

## II

"We review the district court's decision de novo, both because it is a summary judgment, and because it requires us to answer issues of statutory interpretation." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 585 (5th Cir. 2004).

## III

In determining whether CMS's interpretation of the TEFRA reimbursement provisions at issue is permissible, this court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If the statute is clear, then the court must enforce it as written. *See id.* However, if the statute is "silent or ambiguous with respect to the specific issue," *id.* at 843, the court must assess the administrative decision-making process to determine whether the agency's action is entitled to *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 226–31 (2001); *see also BCCA Appeal Group v. EPA*, 355 F.3d 817, 824–25 (5th Cir. 2003). "[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27. If the agency's decision resulted from a sufficiently formal process to warrant deference, *see id.* at 230, then we assess whether the agency's interpretation is "based on a permissible construction of the statute," *Chevron*, 467 U.S. at 843. "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844; *see also Tex. Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 320 (5th Cir. 2001) ("The question is not whether we might have preferred another way to interpret the statute, but whether the agency's decision was a reasonable one.").

## A

Our first step is to determine whether the statute is ambiguous. Both Providers and CMS argue that Congress directly spoke to the issue of how to calculate hospital reimbursements during the disputed years. The district court disagreed. Although the district court found that Congress had specifically defined "target amount" in 42 U.S.C. § 1395ww(b)(3)(A), and Congress had

explicitly defined how caps were to be calculated from 1998 to 2002, the court concluded that Congress had not spoken clearly about how CMS was to calculate reimbursements for any gap period between the expiration of the caps and the implementation of the new PPS payment regime. Accordingly, the district court determined that the statute was silent as to the gap period.

We begin with the text of the statute. The reimbursable "target amount" is defined as follows:

> [T]he term "target amount" means, with respect to a hospital for a particular 12-month cost reporting period – (i) in the case of the first such reporting period for which this subsection is in effect, the allowable operating costs of inpatient hospital services . . . for such hospital for the preceding 12-month cost reporting period, and (ii) in the case of a later reporting period, the target amount for the preceding 12-month cost reporting period, increased by the applicable percentage increase under subparagraph (B) for that particular cost reporting period.

42 U.S.C. § 1395ww(b)(3)(A). The BBA cap provision, governing reimbursements from 1998 to 2002, specified that CMS was to "estimate the 75th percentile of the target amounts for such hospitals within such class" and "update the amount . . . for each cost reporting period . . . by a factor equal to the market basket percentage increase." 42 U.S.C. § 1395ww(b)(3)(H). It further specified that "the target amount for such a hospital or unit may not exceed the amount" calculated under the 75th percentile formula specified. *Id.*

CMS argues that a straightforward reading of these provisions plainly supports its interpretation. Subsection (b)(3)(A)(ii) defines "target amount" for any reporting period after the first period as "the target amount for the preceding 12-month cost reporting period." Since it is undisputed that 2003, 2004, and 2005 qualify as later reporting periods, the agency argues that subsection (b)(3)(A)(ii) unambiguously directed it to calculate Providers' reimbursements based on the preceding year's target amount. And, because subsection (b)(3)(H) requires that from 1998 to 2002, the target amount may not

7

exceed the 75th percentile capped amount, CMS was required to use the final capped target amount paid in 2002 rather than the full hospital-specific amount to calculate the 2003 target amount.

Providers counter that the relevant statutory provisions unambiguously support their interpretation. Providers first argue that CMS's reading only makes sense if § 1395ww(b)(3)(A)(ii) is read in isolation, and that an inquiry into the meaning of the statutory language must bear in mind "the Act's structure or relationship to other statutes." *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 552 (1987). Accordingly, Providers contend that § 1395ww(b)(3)(A)(ii) must be read in light of the immediately preceding subsection. Subsection (b)(3)(A)(i) defines "target amount" for the first reporting period as "the allowable operating costs of inpatient hospital services." Subsection (b)(3)(A)(ii) defines the target amount for subsequent periods as the "target amount for the preceding 12-month cost reporting period," which, according to Providers, ties the definition for later reporting periods in subsection (b)(3)(A)(ii) to the initial "target amount" defined in subsection (b)(3)(A)(i). In other words, a hospital's "target amount" equals its hospital-specific allowable costs from the base year trended forward to the current year.

To bolster that contention, Providers point out that § 1395ww(b)(3)(J) refers to the amount calculated under § 1395ww(b)(3)(H) as "the limiting or cap amount," while the "target amount" is the amount determined under § 1395ww(b)(3)(A). Although § 1395ww(b)(3)(H) states that the "target amount" may not exceed the 75th percentile, according to Providers, Congress's choice of language in § 1395ww(b)(3)(J) makes clear that it intended to distinguish between a "cap amount" under § 1395ww(b)(3)(H) and the "target amount" under § 1395ww(b)(3)(A). Thus, Providers argue, the use of the words "target amount" in subsection (b)(3)(A)(ii) could not have referred to a capped amount even if that capped amount was the amount actually paid in the preceding year.

Finally, and perhaps most persuasively, Providers make two arguments based on legislative intent. First, they argue that Congress's intent in passing TEFRA was that reimbursements always be based on hospital-specific cost. In § 1395ww(b)(3)(A)(i), Congress directed that the target amount be based on a hospital-specific number, and then updated each year from that original number. And, although Congress did not intend hospitals above the 75th percentile of costs to be reimbursed based on their actual costs during the BBA cap period, Congress intended that the BBA cap exception to the usual scheme of reimbursing based on hospital-specific cost was to be time-limited. Additionally, Providers argue that CMS's interpretation thwarts Congress's clear intent that the BBA caps end in 2002. CMS's interpretation has the contrary effect of perpetuating the caps beyond the cap period by using the 2002 cap reimbursement amount as the basis for reimbursement calculations in subsequent years. In fact, under CMS's interpretation, Congress could have achieved the same result by enacting BBA caps for only a single year. But it did not do so. Rather, it imposed caps for a limited time period of five years.

Although both sides make persuasive points, we need not determine which is the better argument. Rather, we are tasked with determining whether Congress has spoken clearly. Based on the plausible, competing arguments put forth by the parties, we are compelled to find the statute ambiguous. *See, e.g.*, *United States v. Valle*, 538 F.3d 341, 345 (5th Cir. 2008) ("A statute is ambiguous if it is susceptible to more than one reasonable interpretation or more than one accepted meaning." (quotations omitted)).

Congress did not specify how CMS was to calculate reimbursements after the expiration of the caps because Congress had directed CMS to implement a PPS regime. However, because the PPS regime was not in place by 2002, CMS was left to calculate reimbursements in the gap. As CMS points out, § 1395ww(b)(3)(A)(ii) defines "target amount" for "later reporting periods" as the target amount for the preceding twelve months. And although Providers

9

attempt to persuade us that the (b)(3)(A)(ii) definition must be read in light of (b)(3)(A)(i), it is not, on the face of the statute, completely obvious that the allowable operating cost language in (b)(3)(A)(i) should be read into (b)(3)(A)(ii). On the other hand, although CMS's textual argument is strong, the structure of the provision indicates that reimbursements in a later reporting period should bear significant relation to the initial cost-based amount. Moreover, Providers present a strong argument that CMS's reading of the statute is contrary to Congress's intent that the BBA caps exist only from 1998 to 2002. But, on the other hand, Congress enacted the 1999 BBRA reforms to shift Providers to the fixed-amount PPS system at the end of the BBA cap period. Thus, Congress's intent changed as to the type of reimbursements Providers were entitled to—from a model of cost-based reimbursements to fixed-amount reimbursements—which Congress expected would be in place at the end of the cap period.

Because neither side is able to demonstrate that Congress unambiguously spoke to the precise issue of how to calculate the target amount in 2003, 2004, and 2005, we find that under the first step of *Chevron* analysis, the statute is ambiguous. *See also Ark. State Hosp. v. Leavitt*, No. 4:07CV00624, 2008 WL 4531714, at *4–5 (E.D. Ark. Oct. 8, 2008) (finding the statute "somewhat unclear . . . as to the factors to be taken into account in calculating the target amounts after . . . 2002"); *Chalmette Med. Ctr., Inc. v. Dep't of Health & Human Servs.*, No. 08-4027, 2009 WL 2488265, at * 4–5 (E.D. La. Aug. 11, 2009) (finding the statute unambiguously directed CMS to calculate the 2003 target amount based on the 2002 capped amount because "when the hospital-specific target amount exceeded the cap, the target amount became the cap amount," but assuming arguendo that the statute was silent and proceeding to the second step of the *Chevron* analysis).

**B**

The parties agree that CMS's regulations are entitled to *Chevron* deference if the statute is ambiguous. Indeed, courts have long recognized Congress's delegation of extremely broad regulatory authority to the agency in the Medicare and Medicaid area. *Wis. Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 497 n.13 (2002). Congress has delegated general rulemaking authority with respect to Medicare to the Secretary, who in turn has delegated that authority to CMS. *See, e.g.*, 42 U.S.C. § 1395hh(a)(1) ("The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter."). Furthermore, CMS's regulations implementing both Congress's initial directive to base reimbursements on a "target amount" as defined in § 1395ww(b)(3)(A) and Congress's later cap program under § 1395ww(b)(3)(H) were the product of notice and comment rulemaking. *See* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1998 Rates; Final Rule, 62 Fed. Reg. 45,966, 46,018 (Aug. 29, 1997) (final rule implementing 42 U.S.C. § 1395ww(b)(3)(H)); Medicare Program; Limitations on Reimbursable Hospital Costs and the Rate of Hospital Cost Increases; Final Rule, 48 Fed. Reg. 39,412, 39,417–19 (Aug. 30, 1983) (final rule implementing 42 U.S.C. § 1395ww(b)(3)(A)). So too was CMS's regulation directing the calculation of reimbursements following the expiration of the cap period. Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2003 Rates; Final Rule, 67 Fed. Reg. 49,982, 50,103–04 (Aug. 1, 2002) (directing that "for cost reporting periods beginning in FY 2003, the hospital or unit should use its previous year's target amount, updated by the appropriate rate-of-increase percentage"). Accordingly, the regulations at issue here are entitled to *Chevron* deference, *see Mead*, 533 U.S. at 226–27, and we will not overturn CMS's interpretation so long as it is not "arbitrary, capricious, or manifestly contrary to the statute," *Chevron*, 467 U.S. at 844.

CMS's decision to base reimbursements in 2003, 2004 and 2005 on the amount of the previous year's reimbursement is not "manifestly contrary to the statute." *Id.* Indeed, § 1395ww(b)(3)(A)(ii) directs CMS to calculate the target amount for any year after the base year as "the target amount for the preceding 12-month cost reporting period, increased by the applicable percentage increase." In 2002, Providers' target amounts exceeded the 75th percentile and thus had to be reduced because, under § 1395ww(b)(3)(H), "the target amount . . . may not exceed" that cap. Thus, basing the 2003 to 2005 reimbursements on the capped amounts rather than the Providers' individual costs is not manifestly contrary to the statutory language, because the previous year's target amount was not permitted to exceed the cap amount. Nor is CMS's position arbitrary or capricious. Under CMS's regulations, the "target amount" is equal to "the hospital's target amount for the previous cost reporting period increased by the update factor." 42 C.F.R. § 413.40(c)(4)(ii). Although Providers' arguments about the proper way to interpret the statute are persuasive, Providers acknowledge that at the second step of the *Chevron* analysis, arguing that one interpretation is "better" than another is a losing game. Thus, although Providers may offer a "better" interpretation by taking into account the structure and purpose of the statute, CMS's reading finds substantial support in the text of § 1395ww(b)(3)(A)(ii) and is backed by solid reasoning. CMS's interpretation, therefore, falls within the range of permissible interpretations.

**IV**

In reviewing Providers' claim that the agency's interpretation of its own regulation is contrary to the text of the regulation, we must first determine whether the regulation is ambiguous. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000). "Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S.

504, 512 (1994) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). However, where a regulation is unambiguous, "[t]o defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen*, 529 U.S. at 588.

## A

Pursuant to its authority under TEFRA, CMS promulgated 42 C.F.R. § 413.40(c)(4)(i)–(ii), defining the calculation of target amounts, and § 413.40(c)(4)(iii), implementing the BBA caps for the period from 1998 to 2002.[1] Under subsection (c)(4)(i), CMS directed its fiscal intermediaries to calculate the target amount as "the hospital's allowable net inpatient operating costs per case for the hospital's base period increased by the update factor for the subject period." For subsequent cost periods, subsection (c)(4)(ii) defined the target amount as the "hospital's target amount for the previous cost reporting period increased by the update factor . . . ." Both subsections (c)(4)(i) and (ii) were "subject to provisions of paragraph (c)(4)(iii)," the provision implementing the BBA caps. Subsection (c)(4)(iii) provided for the calculation of the target amount during the cap period as follows:

> In the case of a psychiatric hospital or unit, rehabilitation hospital or unit, or long-term care hospital, the target amount is the lower of the amounts specified in paragraph (c)(4)(iii)(A) or (c)(4)(iii)(B) of this section.
>   (A) The hospital-specific target amount.
>       (1) In the case of all hospitals and units . . . the hospital-specific target amount is the net allowable costs in a base period increased by the applicable update factors.
>                              * * *
>   (B) One of the following for the applicable cost reporting period–
>       (1) For cost reporting periods beginning during fiscal year 1998, the 75th percentile of target amounts for hospitals in the same class (psychiatric hospital or unit, rehabilitation

---

[1] We note that the current version of the regulations contains some changes to the relevant language. Thus, for the purposes of this discussion, we refer to the 2002 version of the regulations which were in force at the time that the BBA caps ended.

> hospital or unit, or long-term care hospital) for cost reporting periods ending during FY 1996, increased by the applicable market basket percentage up to the first cost reporting period beginning on or after October 1, 1997.
> (2) For cost reporting periods beginning during fiscal year 1999, the amount determined under paragraph (c)(4)(iii)(B)(1) of this section, increased by the market basket percentage up through the subject period, subject to the provisions of paragraph (c)(4)(iv) of this section.
> (3) For cost reporting periods beginning during fiscal year 2000 . . .
>
>               * * *
>
> (4) For cost reporting periods beginning during fiscal years 2001 and 2002 . . .
>
>               * * *

42 C.F.R. 413.40(c)(4)(iii) (2002).[2] After the expiration of the caps, CMS reverted to calculating hospital reimbursements according to subsection (c)(4)(ii). CMS contends that the only reasonable interpretation of the regulations is that all of subsection (c)(4)(iii) expired in 2003 because the statutory authority under which it was promulgated (the BBA) expired at that time. CMS further contends that the Secretary made unequivocal contemporaneous statements at the time of promulgation that the entire subsection would have no effect beyond 2002.

Providers argue that CMS's interpretation is contrary to the text of the regulation. They argue that § 413.40(c)(4)(iii) unambiguously directs how reimbursements were to be calculated following the expiration of the caps. Providers argue that each part of (c)(4)(iii)(B) refers to an explicit year during the time period from 1998 to 2002, and thus, has no effect after 2002. They point out, however, that subsection (c)(4)(iii)(A) contains no such time limits and, because CMS did not revoke subsection (c)(4)(iii) at the expiration of the caps period, the calculations for 2003 to 2005 must be conducted exclusively under that section. They further argue that their reimbursements must be based on

---

[2] Omitted ("* * *") are the particulars of each formula applicable to the calculation of the 75th percentile cap from 1998 to 2002, which are unimportant to the resolution of the issue here.

their reasonable costs, not the capped amounts, because subsection (c)(4)(ii) is "subject to provisions of paragraph (c)(4)(iii)" and the only provision of (c)(4)(iii) in effect after 2002 was subsection (A), directing the calculation of the "hospital-specific target amount (the net allowable costs in a base period increased by the applicable update factors)."

We reject CMS's argument that the regulation is ambiguous. When CMS promulgated (c)(4)(iii), it added the qualifier "[s]ubject to the provisions of paragraph (c)(4)(iii) of this section . . ." to subsections (c)(4)(i) and (ii). That "subject to" qualifier in the two subsections is an unambiguous requirement that the target amount be calculated according to subsection (c)(4)(iii), and only subsection (c)(4)(iii). To read the regulation otherwise would require us to ignore the "subject to" language. *Heaven v. Gonzales*, 473 F.3d 167, 176 (5th Cir. 2006) ("We are to construe [regulations] to give effect to all words and phrases, if possible."). The regulation twice defines "target amount" as "subject to" subsection (c)(4)(iii), and subsection (c)(4)(iii) instructs that the "target amount" is the lower of the "hospital-specific target amount" or the capped amount during the capped years only. After the caps expired in 2002, the only way to calculate reimbursements was the "hospital-specific target amount" under (c)(4)(iii)(A) because (c)(4)(iii)(B), by its terms, no longer applied.

CMS's contention that the Secretary's contemporaneous statements made clear that the entirety of subsection (c)(4)(iii) would expire at the end of the cap period is without support. To be sure, the Secretary did state, when the regulations were promulgated, that the BBA was enacted "to establish caps on the target amounts for excluded hospitals or units for cost reporting periods beginning on or after October 1, 1997, through September 30, 2002." Final Rule, 62 Fed. Reg. 45,966, 46,018 (Aug. 29, 1997). But that statement is merely a recitation of the time-limited regulation as it appears in subsection (c)(4)(iii)(B), not an "unequivocal contemporaneous statement" that the ***entire section*** would have no effect beyond 2002.

15

**B**

Having determined that the regulation is unambiguous, we conclude that CMS's interpretation of the regulation is not entitled to deference. The plain text of subsection (c)(4)(iii) does not support CMS's contention that "the only reasonable interpretation of the regulations is that all of subsection (c)(4)(iii) expired in 2003 because the statutory authority under which it was promulgated (the BBA) expired at that time." Tellingly, until 2005, only subsection (c)(4)(iii)(B)—which contains the caps—had explicit time limits. Section (c)(4)(iii) and subsection (A) contained no time limits. If CMS intended its regulation in subsection (c)(4)(iii) to apply only from 1998 to 2002, it should have expressly limited the time period of the whole section, not just subsection (c)(4)(iii)(B). But CMS did not do so when it initially promulgated subsection (c)(4)(iii).

Only after the expiration of the caps, and in the face of criticism from Providers and other similarly situated hospitals that they should be paid based on their hospital-specific target amount, not the capped amount, did CMS amend subsection (c)(4)(iii) to expressly limit the entire subsection to "cost reporting periods beginning on or after October 1, 1997 through September 30, 2002." 42 C.F.R. § 413.40(c)(4)(iii) (effective October 1, 2005). CMS stated that it intended the 2005 amendment to "clarify the language in § 413.40(c)(4(iii) [] to emphasize that because § 413.40(c)(4)(iii) was no longer applicable for cost reporting periods beginning on or after October 1, 2002 . . . the target amount for FY 2003 would be the cap amount paid in FY 2002, updated to FY 2003." Final Rule, 70 Fed. Reg. 47,278, 47,465 (Aug. 12, 2005). CMS's "clarification," however, is a substantive change to the regulatory text, one that imposes express time limits on the whole of subsection (c)(4)(iii) where previously only subsection (c)(4)(iii)(B) was time-limited. CMS's reversal of course came too late: "The Secretary is bound by her own regulations and rulings until she changes them." *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993); *see also North Ga. Bldg. & Constr.*

16

*Trades Council v. Goldschmidt*, 621 F.2d 697, 710 (5th Cir. 1980) ("[T]he agency is bound to comply with the regulations it promulgates.").

Further, the 2005 amendment betrays CMS's contemporaneous understanding that subsection (c)(4)(iii), as it existed in fiscal years 2003, 2004, and 2005, did not expire according to its own terms. If CMS is correct that the whole of subsection (c)(4)(iii) reasonably could be viewed as having no further effect after 2002, then there would have been no need to amend the regulation in 2005. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.") (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988) (internal quotation marks omitted)). "Despite our substantial deference to an agency's interpretation of the scope or application of its own regulations, . . . we cannot allow [CMS] to ignore its own regulation in an attempt to save its imperfect/unsatisfactory decision-making in this case." *Transactive Corp. v. United States*, 91 F.3d 232, 238 (D.C. Cir. 1996) (citation omitted).

## V

For the foregoing reasons, we REVERSE the district court's grant of summary judgment and REMAND for proceedings consistent with this opinion.