NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0942n.06

Case No. 11-1905

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Aug 23, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MICHIGAN DEPARTMENT OF COMMUNITY HEALTH, et al., | ) ) ) | |
| *Plaintiffs-Appellants*, | ) ) | On Appeal from the United States District Court for the Eastern |
| v. | ) ) | District of Michigan |
| SECRETARY OF HEALTH AND HUMAN SERVICES, et al., | ) ) ) | OPINION |
| *Defendants-Appellees*. | ) ) | |

Before: COLE and DONALD, Circuit Judges; SARGUS, District Judge.[*]

SARGUS, District Judge. Plaintiffs-Appellants, the Michigan Department of Community

Health and the psychiatric hospitals it operates ("Providers"), appeal the district court's grant of

summary judgment in favor of Defendants-Appellees, Secretary Kathleen Sebelius of the United

States Department of Health and Human Services ("HHS") and the Centers for Medicare and

Medicaid Services ("CMS") (together "Agency"[1]) and its denial of the Providers' request for

summary judgment in their favor. The Providers allege that they were not fully reimbursed by the

Agency for psychiatric hospital services provided to Medicare patients during fiscal years 2003

---

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

[1]The CMS is the agency within the HHS that is responsible for administering the Medicare program.

No. 11-1905
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

through 2006. In an attempt to recover nearly $10 million in costs, the Providers filed suit against the Agency contending that the methods it used to calculate the Providers' Medicare reimbursements during fiscal years 2003 through 2006 violated the Medicare statute, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* In granting the Agency's motion for summary judgment and denying the Providers' motion for summary judgment, the district court held that the applicable sections of the Medicare statute are clear and unambiguous and that the Agency's determination of the amount of Medicare reimbursements is compelled by the statute. In the alternative the district court also concluded that, even if the statute is considered ambiguous, it is likely that the Agency would prevail because its regulations would be entitled to deference. For the reasons that follow, we **AFFIRM** the district court's decision.

## I. BACKGROUND

This case concerns the manner in which psychiatric hospitals were reimbursed for care they provided to Medicare beneficiaries after the 2002 expiration of a section of the Medicare statute that provided specific caps on the reimbursed amounts.

### A. Statutes and Regulations

The Medicare program initially utilized the reasonable-cost payment system to determine reimbursements to provider hospitals. Under that system, a hospital would report the total costs of providing services to Medicare beneficiaries at the end of a year and the Agency would reimburse the hospital for the costs it determined were reasonable. Congress modified this system a number

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

of times and with the passage of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), replaced it entirely with the Prospective Payment System ("PPS"). Pub. L. No. 97-248, 96 Stat. 324 (1982); 42 U.S.C. § 1395ww(d)(1)–(4). The PPS requires classification of each patient into a "diagnosis related group," or DRG. *See* Tommy G. Thompson, Prospective Payment System for Inpatient Services in Psychiatric Hospitals and Exempt Units (2002) ("Thompson Report"). Each patient in any given DRG will have a similar illness or disorder which, in theory, will require similar treatment at "relatively similar cost." *Id.* The implementation of the PPS for acute care hospitals in 1983 followed ten years of research and study concerning the appropriate way to classify patients and resulted in nearly 500 distinct DRGs. *Id.* at 4–6. The goal of the PPS is to define payments to hospitals based on patient characteristics rather than the historical practices and expenses of the hospital. With the passage of TEFRA and the implementation of the PPS, Congress largely ended the Agency's historic compensation system that was based on hospitals' actual costs, and which varied widely for different hospitals.

TEFRA imposed a standardized reimbursement system based on specific patient characteristics. TEFRA, however, exempted in-patient psychiatric services from the PPS because those services were difficult to define based on patient characteristics and because there was little consensus about a national standard of care for in-patient psychiatric services. *See* 42 U.S.C. § 1395ww(a)–(b) (outlining payment plans for certain types of facilities).

**1. TEFRA - Target Amounts Pre-1998**

3

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

Under TEFRA, the PPS exempt providers, such as the Providers herein, continued to be reimbursed for their actual "operating costs" as long as those costs did not exceed a defined "target amount." 42 U.S.C. § 1395ww(b)(1)(A). In the first fiscal year after TEFRA was enacted, the "target amount" was defined as the "allowable operating costs . . . for the preceding 12-month cost reporting period." 42 U.S.C. § 1395ww(b)(3)(A)(i). Thus, the initial target amounts were based on each hospital's actual operating costs. In later years, the "target amount" was defined as "the target amount for the preceding 12-month cost reporting period" plus a standard percentage increase identified by the statute and regulations. 42 U.S.C. § 1395ww(b)(3)(A)(ii).

The Agency issued regulations implementing Congress's definition of target amount in 42 § C.F.R. § 413.40.[2] After determining the target amount for a particular year, a reimbursement ceiling was calculated by multiplying the target amount for a hospital by the number of discharges from that hospital in the same year. *See* 42 C.F.R. § 413.40(a)(3). Reimbursements could not exceed the ceiling. *Id.* The Agency also issued regulations instructing its intermediaries[3] on the method by which a hospital's target amount was to be calculated in a base year and updating it in subsequent years. *See* 42 C.F.R. § 413.40(c)(4)(i)–(ii).

---

[2]The Agency first promulgated what is now 42 C.F.R. § 413.40 in1982 as 42 C.F.R. § 405.463. *See* 47 Fed. Reg. 43,282, 43,291 (Sept. 30, 1982) (interim final rule). The Agency redesignated the relevant sections of 42 C.F.R. Part 405 into new Part 413 in 1986. *See* 51 Fed. Reg. 34,790 (Sept. 30, 1986). Section 405.463 will be referred to as § 413.40 to avoid confusion.

[3]Fiscal intermediaries are private contractors employed by the Agency to administer its Medicare reimbursement program.

4

No. 11-1905
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

This procedure was followed consistently until 1997, when Congress responded to "significant variation" in the TEFRA ceilings of different hospitals by enacting further limitations to the reasonable-cost based reimbursement in the Balanced Budget Act of 1997 ("BBA"), § 4414, Pub. L. No. 105-33, 111 Stat. 251, 405 (codified at 42 U.S.C. § 1395ww(b)(3)(H)). H.R. Rep. No. 105-149, at 1336 (1997).

### 2. BBA - Target Amounts 1998 through 2002

As part of the BBA, Congress added limits, or caps, on reimbursement payments, including those for psychiatric hospitals. *See* 42 U.S.C. § 1395ww(b)(3)(H)(i)–(ii). The caps were instituted to achieve federal budget savings. *See* Rehabilitation and Long-Term Care Hospital Payments: Hearing before the Subcomm. on Health of the H. Comm. on Ways and Means, 105th Cong. at 60 (1997), Rec. Doc. No. 17-3. For fiscal years 1998 through 2002, the target amounts for psychiatric hospitals could not exceed the 75th percentile of target amounts for all hospitals in the same class of providers. *See id.* Much like TEFRA, the BBA required that this capped amount be multiplied by update factors prescribed as part of the cap scheme for each year of the five-year period. 42 U.S.C. § 1395ww(b)(3)(H)(i).

The Agency promulgated regulations implementing the BBA cap scheme. *See* 42 C.F.R. § 413.40(c)(4)(iii). The cap regulation specified the calculation of a "hospital-specific target amount," defined as the "net allowable costs in a base period increased by the applicable update factors" for the subject period. 42 C.F.R. § 413.40(c)(4)(iii)(A). That amount was then to be compared to the 75th percentile of the target amount for hospitals in the same class. 42 C.F.R. § 413.40(c)(4)(iii)(B).

5

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

The final target amount for reimbursement "is the lower of the amounts specified" in subsections (c)(4)(iii)(A) and (B).

This procedure was followed consistently until 2002, when the Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act ("BBRA"), which was enacted by Congress in 1999, further refined the reimbursement rules for providers. Pub. L. No. 106-113, 113 Stat. 1501 (1999).

### 3.  BBRA - Target Amounts Post-2002

In the BBRA, Congress directed that, upon expiration of the BBA caps, the Agency was to make "payments for inpatient hospital services furnished by psychiatric hospitals or units . . . in accordance with the prospective payment system [PPS]." Pub. L. No. 106-113, 113 Stat. 1501 (1999). The Agency was unable to implement Congress's directive at the end of the cap period[4] and instead calculated the psychiatric hospitals' target amounts by using the statute and regulations that were in place at that time–42 U.S.C. § 1395ww(b)(3)(A)(ii) and 42 C.F.R. § 413.40(c)(4)(ii). Specifically, the Agency took the previous year's target amount, updated by the applicable inflation

---

[4]As the district court explained, the BBRA also required that the Agency submit a report to Congress by October 1, 2001, explaining the development and implementation of the PPS for psychiatric hospitals. Although the Agency did not implement the PPS for psychiatric hospitals, they still submitted the report, *i.e.*, the Thompson Report. (Dist. Ct. Op., Dist. Ct. Docket No. 31, at 4.) The report explained that defining patient characteristics with regard to psychiatric hospitals is more difficult than it is with regard to acute care hospitals. *Id.* at 24. Psychiatric disorders are more difficult to define and classify, and any specific definition does not always explain the full reason for a patient's admission. *Id.* The report concluded that the development of a comprehensive PPS for psychiatric hospitals would require additional research. *Id.* at 44–47. The report noted that the Agency would miss the BBRA's implementation deadline, but endeavored to "proceed as quickly as possible." *Id.* at 47.

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

factor. Thus, a hospital's target amount for 2003 was the target amount actually used for 2002 (which had the 75th percentile cap provision applied) updated by the inflation factor set by statute.

In August 2005, and effective October 1, 2005, the Agency added an introductory phrase to 42 C.F.R. § 413.40(c)(4)(iii), which specified that the entire section was to apply "[f]or cost reporting periods beginning on or after October 1, 1997 through September 30, 2002." 42 C.F.R. § 413.40(c)(4)(iii) (2008). This language supports the way in which the Agency had been calculating the reimbursements since the expiration of the BBA caps. During the first three periods of time at issue in this case (2003, 2004, 2005) that introductory language was not present.

From 2005 through 2008, the Agency gradually moved the psychiatric hospitals over to the new PPS that had been drafted for psychiatric hospitals. 69 Fed. Reg. at 66, 980; 42 C.F.R. § 412.426(a). Reimbursement payments during the only transition-phase year at issue in this case, fiscal year 2006, were 25% based on the new PPS amounts and 75% based on the TEFRA target amounts.

## B. Facts and Procedure

The facts in this case are not in dispute. During the BBA period, from 1998 to 2002, the Providers' reimbursement amounts were calculated pursuant to 42 C.F.R. § 413.40(c)(4)(iii). For each year during this period, the Providers' target amounts were the 75th percentile amounts described in § 413.40(c)(4)(iii)(B) because their hospital-specific target amounts exceeded this 75th percentile cap.

7

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

For fiscal years 2003 and 2004, the Agency's fiscal intermediary calculated the Providers' TEFRA target amount figures without the 75th percentile adjustment. The Agency audited these calculations and found them to be incorrect. The Agency directed the intermediary to re-calculate the Providers' reimbursement amounts using their target amounts from the previous year pursuant to 42 U.S.C. § 1395ww(b)(3)(A)(ii). Therefore, the Providers' fiscal year 2003 target amounts were based on their fiscal year 2002 target amounts, which had been the 75th percentile target amount described in 42 C.F.R. § 413.40(c)(4)(iii)(B) instead of the hospital-specific target amount described in 42 C.F.R. § 413.40(c)(4)(iii)(A). The intermediary then calculated the Providers' reimbursements for fiscal years 2005 and 2006 in the same manner the Agency directed for fiscal years 2003 and 2004, with the added instructions to the 2006 calculations set forth in 42 C.F.R. § 412.426(a).

The Providers appealed the calculation of their reimbursement amounts to the Provider Reimbursement Review Board ("Board") pursuant to 42 U.S.C. § 1395oo(a). The Board concluded that it lacked the authority to decide the appeal, because the issue required determining the legality of Agency regulations, and granted the Providers' request for expedited judicial review. The Providers, in like fashion of other groups of psychiatric hospitals across the United States, commenced this suit in district court in the Eastern District of Michigan pursuant to 42 U.S.C. § 1395oo(f)(1), and both parties moved for summary judgment. Applying *Chevron U.S.A., Inc v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the district court held that the "plain language of the statute controls the outcome of this case." (Dist. Ct. Op., R. 31, at 12.) The district court determined that the Agency correctly calculated the Medicare reimbursements because the

8

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

statute unambiguously provides that "the target amount for 2003 was based on the previous year's target amount multiplied by the applicable update factor." *Id.* at 10. Thus, the "previous year's target amount," the court held, was the target amount actually used in the previous year. The district court further determined that even if the statute were ambiguous, the regulations would be entitled to deference because they were the result of formal decisionmaking and are reasonable. The district court, therefore, granted the Agency's motion for summary judgment and denied the Providers' motion for summary judgment.

## II. ANALYSIS

### A. Standards

#### 1. Summary Judgment

The "Court reviews a grant of summary judgment *de novo* and considers the facts and any inferences drawn from the facts in the light most favorable to the non-moving party." *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (citing *White v. Detroit Edison Co.*, 472 F.3d 420, 424 (6th Cir. 2006)). "Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving parties are entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)). "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

#### 2. Review of Administrative Action

9

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

"An agency is obliged to interpret its implementing legislation in a reasonable manner and may not make findings or promulgate regulations in a manner that is arbitrary or capricious in substance, or manifestly contrary to the statute." *Clark Reg'l Med. Ctr. v. United States HHS*, 314 F.3d 241, 244 (6th Cir. 2002) (citing 5 U.S.C. § 706(2)(A); *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)).

In *Chevron*, the Supreme Court established a two-step process for reviewing an agency's interpretation of a statute that it administers. *Id.* (citing *Chevron*, 467 U.S. 837). "'First, always, is the question whether Congress has directly spoken to the *precise question at issue*. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Id.* at 245 (quoting *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 273 (6th Cir. 1994)) (emphasis in original). "The Supreme Court has explained that 'the judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.'" *Id.* (quoting *Chevron*, 467 U.S. at 843 n.9).

Second, if we determine "that Congress has not directly addressed the precise question at issue, that is, that the statute is silent or ambiguous on the specific issue, we must determine 'whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Jewish Hosp., Inc.*, 19 F.3d at 273). "In assessing whether the agency's construction is permissible, 'we need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [we] would have reached if the question initially had

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

arisen in a judicial proceeding.'" *Id.* (quoting *Jewish Hosp., Inc.*, 19 F.3d at 273–74) (alteration in original). "In fact, the agency's construction is entitled to deference unless 'arbitrary, capricious, or manifestly contrary to the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 844).

Under the Administrative Procedures Act, "[o]ur review of an agency's interpretation of its own regulations is highly deferential." *Id.* We "review an agency decision to see whether it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law.'" *Id.* (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). "[A]n agency's interpretation of a regulation must be given controlling weight unless it is 'plainly erroneous or inconsistent with the regulation.'" *Id.* (citing *Thomas Jefferson Univ.*, 512 U.S. at 512).

**B. Statutory Interpretation**

The Providers and the Agency both argue that the statutory language is clear and unambiguous, although each urges very different interpretations. The statutory language at issue is TEFRA's definition of "target amount," which reads:

> (3)(A) [F]or purposes of this subsection, the term "target amount" means, with respect to a hospital for a particular 12-month cost reporting period–
>
>> (i) in the case of the first such reporting period for which this subsection is in effect, the allowable operating costs of inpatient hospital services (as defined in subsection (a)(4)) recognized under this title [42 U.S.C.S. §§ 1395 *et seq.*] for such hospital for the preceding 12-month cost reporting period, and
>>
>> (ii) in the case of a later reporting period, the target amount for the preceding 12-month cost reporting period, increased by the applicable percentage increase under subparagraph (B) for that particular cost reporting period.

No. 11-1905
Michigan Dept. of Community Health, et al.
v. Secretary of HHS, et al.

42 U.S.C. § 1395ww(b)(3)(A)(i) and (ii).

### 1. Plain Language

The Agency contends that, subsection (i) of 42 U.S.C. § 1395ww(b)(3)(A) is inapplicable because this is not the "first such reporting period" that the provision is in effect, which was 1983. Thus, under subsection (ii) of the statute, the target amount for fiscal years 2003, 2004, 2005 and 2006 is "the target amount for the preceding 12-month cost reporting period" increased by the applicable update factor. Beginning with fiscal year 2003, the critical year in this analysis, the target amount for the previous 12-month reporting period—fiscal year 2002—was governed by the BBA. Under the BBA, the target amount for fiscal year 2002 was also governed by 42 U.S.C. § 1395ww(b)(3)(A), but it was capped at the Agency's "estimate [of] the 75th percentile of the target amounts for such hospitals within such class[.]" 42 U.S.C. § 1395ww(b)(3)(H). The 2003 target amount, according to the Agency, is based on the capped 2002 target amount increased by the applicable update factor. 42 U.S.C. § 1395ww(b)(3)(A)(ii).

The Providers assert that the Agency's interpretation of the statute focuses too closely on paragraph (ii) of § 1395ww(b)(3)(A), and impermissibly ignores paragraph (i), which was intended to provide a specific "base year" for each provider. The Providers explain:

> [The Agency's] interpretation ignores the impact of subsection (i) of the provision, the purpose of which was to establish a base year for each provider. This definition of "target amount" was operative long before Congress amended the statute in 1997

12

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

> to enact the caps for 1998 through 2002. And, in that time before the caps, the target amount was always a figure resting upon the actual costs incurred by each Provider in its base year. *See, e.g.*, *Abbott-Northwestern Hosp. v. Leavitt*, 377 F. Supp. 2d 119, 121–123 (D. D.C. 2005). Those costs, rooted in subsection (i), formed the initial target amount that was updated annually in accordance with subsection (ii) of the statute to yield the next period's target amount.

(Providers' Br. at 16.)

We agree with the district court that, while the Providers' arguments have some merit, they are "insufficient to overcome the plain and obvious meaning of the statute itself." (Dist. Ct. Op. at 9) (citing *Hardy Wilson Mem. Hosp. v. Sebelius*, 616 F.3d 449, 455–57 (5th Cir. 2010) ("*Hardy Wilson II*")[5]). We "'discern an unambiguous and plain meaning from the language of the statute, [and thus,] our task is at an end.'" *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001) (quoting *Bartlik v. U.S. Dep't of Labor*, 62 F.3d 163, 166 (6th Cir. 1995)). The cap imposed by the BBA expired following fiscal year 2002. When implementation of the PPS was delayed, the Agency was required to reimburse the hospitals in accordance with the statutory language that was in place.

The statutory language that was in place provided two options: Either the Providers could be reimbursed for their actual costs under paragraph (i) or they could be reimbursed based on the previous year's target amount under paragraph (ii). 42 U.S.C. § 1395ww(b)(3)(A). Subsection (i) applies only in the "first such reporting period" for which TEFRA was in effect—which occurred

_____

[5]The Court notes that even the *Hardy Wilson II* court, which determined the statute is ambiguous, found the Providers' argument here weak, stating that "although Providers attempt to persuade us that the (b)(3)(A)(ii) definition must be read in light of (b)(3)(A)(i), it is not, on the face of the statute, completely obvious that the allowable operating cost language in (b)(3)(A)(i) should be read into (b)(3)(A)(ii)." 616 F.3d at 457

No. 11-1905
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

in 1983–not 2003.  Thus, by its own terms, paragraph (i) did not apply in fiscal year 2003.  The Agency was therefore required to look to paragraph (ii).  Under paragraph (ii), the target amount for fiscal year 2003 was based on the previous year's target amount multiplied by the applicable update factor.  This is the same conclusion reached by *Ancora Psychiatric Hosp. v. Sec'y of the United States HHS*, 417 F. App'x 171 (3d Cir. 2011) ("*Ancora II*"), *Ancora Psychiatric Hosp. v. Leavitt*, No. 09-0009, 2010 U.S. Dist. LEXIS 21460 (D.N.J. Mar. 8, 2010) and *Chalmette Med. Ctr., Inc. v. United States HHS*, No. 08-4027 SECTION "L"(5), 2009 U.S. Dist. LEXIS 75819 (E.D. La. Aug. 10, 2009), and it must be followed unless it "would lead to absurd results or an interpretation which is inconsistent with the intent of Congress."  *Walker*, 257 F.3d at 667 (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995)).

### 2.  Absurd Result or Inconsistent with Congressional Intent

Our conclusion that the statute is unambiguous is neither absurd nor inconsistent with the intent of Congress.  While Congress intended the BBA caps to be implemented only for a limited period of time, that fact does not, as the Providers submit, reflect that Congress intended to revert back to a system based upon hospital-specific target amounts.  The Providers ignore the fact that Congress anticipated the BBA caps to be immediately replaced with the PPS, another system like the BBA cap system that is not based on hospital-specific target amounts.  A review of the Medicare reimbursement legislation leaves no question as to Congress's intent.

14

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

TEFRA was enacted in 1983 and has remained in place since. Later legislation, including the BBA and the BBRA, supplemented and amended TEFRA, but *the original statute was never replaced or repealed*. In 1998 the reimbursement rates were limited by the BBA, which placed a national cap on the total reimbursement rate, to achieve federal budget savings. Then again in 1999 Congress passed legislation, the BBRA, that placed additional limits on the reimbursement scheme by removing the psychiatric hospital's exemption from the PPA and mandating a national psychiatric hospital PPA that would require compensating the hospitals based on patient characteristics rather than historical practices. The Court agrees with the district court's observation that if, as the Providers contend, "the reimbursement rate for fiscal year 2003 is based on each hospital's actual costs, rather than the previous year's target rate multiplied by an update factor, it would turn Congress's intent on its head." (Dist. Ct. Op., R. 31, at 11.)

The legislation unequivocally demonstrates a progressive effort to do the opposite of what the Providers request. That is, the legislation clearly seeks to reimburse psychiatric hospitals based on objective patient characteristics and consistent national standards, and to rein in the disproportionately expensive treatment provided by certain hospitals. Again as the district court noted, if the Providers' interpretation of the statute were to prevail, it would reward hospitals for providing expensive treatment regardless of its effectiveness or the specific characteristics of its patients. Nothing about Congress's legislative changes would remotely suggest such an intention.

Accordingly, because fiscal year 2003 was not the first such reporting period for which

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

TEFRA was in effect, reimbursement rates must be based on the capped target amount for the previous fiscal year multiplied by the applicable update factor. 42 U.S.C. § 1395ww(b)(3)(A)(ii).

### 3. The Providers' Additional Arguments

As to the Providers' additional arguments, the district court simply indicated that they were not completely without merit, citing to *Hardy Wilson II*, 616 F.3d at 455–57, but did not address them in any detail. A more thorough examination of the Providers' arguments does nothing to cast doubt on the propriety of the district court's decision nor does it change our conclusion here.

First, the Providers argue that congressional intent to establish a psychiatric hospital's target amount with reference to its hospital-specific base year reasonable costs can be shown by the fact that Congress distinguished between the "target amount" defined in 42 U.S.C. § 1395ww(b)(3)(A) and the "cap amount" defined in subpart 42 U.S.C. § 1395ww(b)(3)(H) when it enacted 42 U.S.C. § 1395ww(b)(3)(J) (the update factor section directed to subsection (H)). (Providers' Br. at 19-20; Reply at 8–10.) Subsection (J) refers to the 75th percentile figure from subsection (H) as "the limiting or cap amount" and refers to the amount calculated in subsection (A) as the "target amount." The Providers assert that we should not construe different terms within a statute to embody the same meaning. Therefore, the argument goes, "target amount" should always be first based upon a hospital's base year reasonable cost and subsection (H) created a new concept called a "cap amount."

This analysis, however, ignores the plain language in subsection (H) that explains how to calculate the "target amount" for fiscal years 1998 through 2002. Nowhere in subsection (H) is the term "cap amount" used. And, subsection (J) does not define that term, but rather uses the phrase

16

No. 11-1905
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

"limiting or cap amount" to distinguish the target amount calculated under the BBA from the original

TEFRA definition of target amount in subsection (A). Thus, subsection (J) logically uses different

terms to distinguish two different figures in the same provision, either of which could qualify as the

target amount depending on whether the cost reporting period falls into the years governed by the

BBA provisions found in subsection (H).

Next, the Providers contend that the Agency's interpretation of the statute renders

meaningless the time limitation ("through 2002") imposed by the cap provision in subsection (H).

(Providers' Br. at 17–18.) However, as the district court correctly opined, the Agency's

interpretation of the statute recognizes this limitation. (Dist. Ct. Op., R. 31, at 11, n.1.) The Agency

does not apply the cap in 2003. Rather, it uses the 2002 target amount, which was capped, to

calculate the 2003 target amount. *See Ancora II*, 417 F. App'x at 175 ("[T]he statute clearly states

that, beginning in [fiscal year 2003], the target amount for each hospital facility is no longer subject

to capping under the BBA-imposed rules. However, the procedure adopted by [the Agency] satisfies

that requirement."). Therefore, we find that the Agency's interpretation does give effect to all of the

words in the statute. *See Walker*, 257 F.3d at 667 ("Every word in the statute is presumed to have

meaning, and we must give effect to all the words to avoid an interpretation which would render

words superfluous or redundant.") (citations omitted).

Finally, without making a direct argument to this issue the Providers suggest that the Agency

should be bound by the intermediary's initial assessment, which applied the statute in the way in

which the Providers want it applied. (Providers' Br. at 5–7, 16–17.) The fiscal intermediary's role,

17

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

however, is that of a conduit; it is not tasked with or given the power to resolve policy questions. *See Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984) (finding that the government was not bound by representations made by a Medicare fiscal intermediary, and stating that "[t]he relevant statute, regulations, and Reimbursement Manual" made it "perfectly clear" that the intermediary is a conduit and does not make policy decisions); *see also Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d 1050, 1053 n.4 (D.C. Cir. 1997) ("[T]he intermediary's position is not the Secretary's[.]"). Consequently, the Agency is not bound by the intermediary's initial calculation.

### 4. Courts Finding Ambiguity

The Court notes that its conclusion that the statute is not ambiguous nor silent on the issue before it is at odds with two district court opinions, *Arkansas State Hosp. v. Leavitt*, No. 4:07CV00624, 2008 U.S. Dist. LEXIS 84567 (E.D. Ark. Oct. 8, 2008) and *Hardy Wilson Mem. Hosp. v. Leavitt*, No. 5:08cv4-DCB-JMR, 2009 U.S. Dist. LEXIS 27819 (S.D. Miss. Mar. 30, 2009) ("*Hardy Wilson I*"), and the Fifth Circuit's *Hardy Wilson II* decision. In finding ambiguity, those courts relied on their determination that Congress did not speak specifically to how Medicare reimbursements would proceed in the gap period between the expiration of the BBA caps and the implementation of the PPS. The Court is unpersuaded by this analysis for two reasons.

First, to conclude that there is a gap period requires an assessment beyond the plain language of the statute. The plain language, as discussed *supra*, unequivocally indicates how to determine the target amount in the years after the first reporting year. Simply because application of that statutory

18

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

mandate in the post-BBA cap period results in a kind of "echo effect" does nothing to alter the plain language of the statute nor does it indicate that application of the plain language is contrary to congressional intent. We agree with the Third Circuit's rationale that, "[g]iven a statutory structure where target amounts are supposed to grow by a specific inflationary percentage each year, it is neither surprising nor obviously contrary to Congressional intent that a limitation imposed in one year would have a kind of 'echo' effect in subsequent years." *Ancora II*, 417 F. App'x at 176. And, as the *Chalmette Medical Center* court determined, "[i]f Congress wanted the target amount to be the hospital-specific target amount after 2002, rather than the actual, applied target amount (which, in [the providers'] case, was capped), Congress could have done so. Instead, the statute continued to direct that the target amount should be based upon last year's target amount, modified by an update factor." 2009 U.S. Dist. LEXIS 75819, at *16–17.

Second, while the best indication of Congressional intent is the language of the statute, our interpretation of that language cannot lead to absurd results or be contrary to the stated intent of Congress. The courts finding ambiguity were not troubled by the fact that, as discussed above, Congress repeatedly stated its intent to desert a hospital-specific cost based system, and even passed two separate pieces of legislation in a two-year period to implement this intention, *i.e.*, the BBA in 1997 and the BBRA in 1999. Reversion back to a hospital-specific cost based system flies in the face of Congress's unequivocally stated intention.

**C. The Regulations**

19

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

Even if we were to find the statute susceptible to more than one reasonable interpretation, we would still affirm summary judgment in favor of the Agency because its regulations are entitled to deference and the Agency's interpretation of its regulations is entitled to deference.

Pursuant to its authority under TEFRA, the Agency promulgated 42 C.F.R. § 413.40(c)(4)(i)–(ii), defining the calculation of target amounts. *See* 47 Fed. Reg. 43,282, 43,291 (Sept. 30, 1982) (interim final rule); 48 Fed. Reg. 39,412, 39,417–19 (Aug. 30, 1983) (final rule). That regulations reads:

> (c)(4) Target amount. The intermediary will establish a target amount for each hospital. The target amount for each cost reporting period is determined as follows:
>
> > (i) For the first cost reporting period to which this ceiling applies, the target amount equals the hospital's allowable net inpatient operating costs per case for the hospital's base period increased by the update factor for the subject period.
> >
> > (ii) For subsequent cost reporting periods, the target amount equals the hospital's target amount for the previous cost reporting period increased by the update factor for the subject cost reporting period, unless the provisions of paragraph (c)(5)(ii) of this section apply.

42 C.F.R. § 413.40(c)(4)(i)–(ii) (1990).

The Agency revised its regulations to implement the BBA-mandated limit on target amounts, codified at 42 U.S.C. § 1395ww(b)(3)(H), by adding subpart (iii) to 42 C.F.R. § 413.40(c)(4).[6] *See*

---

[6]The current version of the regulations contains some changes to the relevant language. Thus, for the purposes of this discussion, we refer to the 2002 version of the regulations which were in force at the time that the BBA caps ended.

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

62 Fed. Reg. at 46,032-33 (interim final rule); 63 Fed. Reg. 26,318, 26,358 (May 12, 1998) (final

rule). The Agency also amended subparts (i) and (ii) to provide that both were now "subject to the

provisions of paragraph (c)(4)(iii)."

The relevant parts of § 413.40(c)(4)(iii), as amended,[7] provide:

In the case of a psychiatric hospital . . . the target amount is the lower of the amounts specified in paragraph (c)(4)(iii)(A) or (c)(4)(iii)(B) of this section.

(A) The hospital-specific target amount.

(1) In the case of all [psychiatric] hospitals . . . the hospital-specific target amount is the net allowable costs in a base period increased by the applicable update factors.
. . . .

(B) One of the following for the applicable cost reporting period—

(1) For cost reporting periods beginning during fiscal year 1998, the 75th percentile of target amounts for hospitals in the same class [as updated] . . . .

(2) For cost reporting periods beginning during fiscal year 1999, the amount determined under paragraph (c)(4)(iii)(B)(1) of this section, [as updated] . . . .

(3) For cost reporting periods beginning during fiscal year 2000B [the 75th percentile of target amounts for hospitals in the same class as updated with wage adjustments] . . . .

(4) For cost reporting periods beginning during fiscal years 2001 through 2002.

---

[7]The Agency amended 42 C.F.R. § 413.40(c)(4)(iii) to account for wage adjustments in the specific update factors for 2000 through 2002. The particular formulas used to update the 75th percentile target amounts are not contested and have been omitted.

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

42 C.F.R. 413.40(c)(4)(iii) (2002).

## 1. Deference to the Regulations

We find that the Agency's regulations are entitled to deference because they are reasonable and the product of the Agency's rulemaking authority. *See Ancora II*, 417 F. App'x 171; *Hardy Wilson II*, 616 F.3d 449; *Ancora I*, 2010 U.S. Dist. LEXIS 21460; *Chalmette Med. Ctr*, 2009 U.S. Dist. LEXIS 75819; *Hardy Wilson I*, 2009 U.S. Dist. LEXIS 27819; *Arkansas State Hosp.,* 2008 U.S. Dist. LEXIS 84567. As the *Hardy Wilson II* court observed:

> [C]ourts have long recognized Congress's delegation of extremely broad regulatory authority to the agency in the Medicare and Medicaid area. *Wis. Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 497 n.13 (2002). Congress has delegated general rulemaking authority with respect to Medicare to the Secretary, who in turn has delegated that authority to CMS. *See, e.g.*, 42 U.S.C. § 1395hh(a)(1) ("The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter."). Furthermore, CMS's regulations implementing both Congress's initial directive to base reimbursements on a "target amount" as defined in § 1395ww(b)(3)(A) and Congress's later cap program under § 1395ww(b)(3)(H) were the product of notice and comment rulemaking. *See* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1998 Rates; Final Rule, 62 Fed. Reg. 45,966, 46,018 (Aug. 29, 1997) (final rule implementing 42 U.S.C. § 1395ww(b)(3)(H)); Medicare Program; Limitations on Reimbursable Hospital Costs and the Rate of Hospital Cost Increases; Final Rule, 48 Fed. Reg. 39,412, 39,417-19 (Aug. 30, 1983) (final rule implementing 42 U.S.C. § 1395ww(b)(3)(A)). So too was CMS's regulation directing the calculation of reimbursements following the expiration of the cap period. Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2003 Rates; Final Rule, 67 Fed. Reg. 49,982, 50,103–04 (Aug. 1, 2002) (directing that "for cost reporting periods beginning in FY 2003, the hospital or unit should use its previous year's target amount, updated by the appropriate rate-of-increase percentage"). Accordingly, the regulations at issue here are entitled to *Chevron* deference, *see Mead*, 533 U.S. at 226–27, and we will not overturn CMS's interpretation so long as it is not "arbitrary, capricious, or manifestly contrary to the statute," *Chevron*, 467 U.S. at 844.

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

616 F.3d at 457–58 (parallel citations omitted).

The Providers here assert that the Agency violated the congressional mandate set forth in the BBRA requiring the PPS to take effect at the expiration of the BBA caps. The Providers argue that, under these circumstances, *Chevron* deference is inappropriate. (Providers' Br. at 18–19) (citing as examples "*Aronov v. Chertoff*, 536 F.3d 30, 49 (1st Cir. 2008) [*rev'd en banc*, 562 F.3d 84 (1st Cir. Mass. 2009)] ('the government's attempt to invoke an administrative policy to trump an explicit statutory command turns *Chevron* deference on its head'); *Sierra Club v. Strock*, 495 F. Supp. 2d 1188 (S. Dist. of FL, 2007) ('Clearly, deference is not absolute but rather admits of exceptions for those rare occasions when agencies fail abide by their own regulations or statutory directives')." We are unpersuaded by this argument.

As to the *Aronov* case, it is inapposite. The agency in *Aronov* attempted to invoke *Chevron* not to determine whether its regulations were entitled to deference in the face of an ambiguous statutory directive, but rather to determine whether an administrative policy was entitled to deference in the face of explicit statutory direction to the contrary. There was no regulation upon which the agency relied. Instead, the agency sought deference to its unwritten policy, which was in direct contravention of the statutory language. Nothing in *Aronov* is helpful to the Providers' position.

With regard to *Sierra Club*, it too does nothing to support the Providers' position. In a 136-page opinion, the Florida district court in *Sierra Club* evaluated whether "to engage in an 'equitable' balancing and to take the extraordinary step of not setting aside, or vacating, the very permits which [the court] long ago concluded should not have been issued [because they were not issued in

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

accordance with the agency's regulations]." *Sierra Club*, 495 F. Supp. 2d at 1206. The district court explained that "[a] court's blind adherence to the principles of agency deference, particularly when faced with the agency's own acknowledgment of serious deficiencies, is contrary to the doctrine of separation of powers." *Id.* at 1208–09 ("The Court previously found that the [agency] violated multiple provisions of [the regulations].").   The general principles espoused in *Sierra Club* are certainly applicable here, as they are in any case that necessitates a *Chevron* analysis, but they do not stand for the proposition that *Chevron* deference is inapplicable to the instant action.

Here, the Agency's decision on how to calculate the Medicare reimbursements did not violate multiple provisions of the statute or regulations.   While simultaneously working to draft the complicated medical payment plan necessary to implement the PPA, the Agency was required to continue to reimburse the Providers.   In the face of the inability to enact the PPA in the time frame directed by Congress, the Agency based reimbursements after the BBA caps expired in 2002 on the amount of the previous year's reimbursement, which is, as explained above, compelled by the statute.

Further, the Agency's position is neither arbitrary nor capricious.   Under the Agency's regulations, the "target amount" is equal to "the hospital's target amount for the previous cost reporting period increased by the update factor."   42 C.F.R. § 413.40(c)(4)(ii).   Although the Providers' own interpretation of the statute is somewhat persuasive, that conclusion is of no moment. Indeed,  "at the second step of the *Chevron* analysis, arguing that one interpretation is 'better' than another is a losing  game." *Hardy Wilson II*, 616 F.3d at 458.  Consequently, even if the Providers

24

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

offered a "better" interpretation, the Agency's reading finds substantial support in the text of 42

U.S.C. § 1395ww(b)(3)(A)(ii) and is backed by sound reasoning. The Agency's interpretation,

therefore, falls within the range of permissible interpretations. *See Clark Reg'l Med. Ctr.*, 314 F.3d

at 245 ("In assessing whether the agency's construction is permissible, we need not conclude that

the agency construction was the only one it permissibly could have adopted to uphold the

construction, or even the reading [we] would have reached if the question initially had arisen in a

judicial proceeding. . . . [rather] the agency's construction is entitled to deference unless arbitrary,

capricious, or manifestly contrary to the statute." (citing *Chevron*, 467 U.S. at 844) (internal citation

and quotations omitted); *Hardy Wilson II*, 616 F.3d at 458 ("Thus, although Providers may offer a

'better' interpretation by taking into account the structure and purpose of the statute, CMS's reading

finds substantial support in the text of § 1395ww(b)(3)(A)(ii) and is backed by solid reasoning.

CMS's interpretation, therefore, falls within the range of permissible interpretations.").

### 2. The Agency's Interpretation of its Regulations

After the expiration of the BBA caps, the Agency reverted to calculating hospital

reimbursements according to 42 C.F.R. § 413.40(c)(4)(ii), which set each hospital's target amount

equal to the previous year's target amount increased by a statutory update factor. The parties

disagree as to whether the Agency's interpretation of its regulation in this way is entitled to

deference. This dispute requires us to review the Agency's interpretation of its own regulation,

which as indicated *supra*, is entitled to a "highly deferential" review to see only if the Agency

No. 11-1905
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

decision "is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law.'" *Clark Reg'l Med. Ctr.*, 314 F.3d at 245 (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512).

The Providers argue that the Agency's interpretation is contrary to the text of the regulation. They posit that 42 C.F.R. § 413.40(c)(4)(iii) unambiguously directs how reimbursements are to be calculated following the expiration of the BBA caps. (Providers' Br. at 22–29.) That is, each part of subsection (c)(4)(iii)(B) refers to an explicit year during the time period from 1998 to 2002, and thus, has no effect after 2002. They point out, however, that subsection (c)(4)(iii)(A) contains no such time limits and, because the Agency did not revoke subsection (c)(4)(iii) at the expiration of the caps period, the calculations post-2002 must be conducted exclusively under (c)(4)(iii)(A), which provides that the target amount is the hospital specific costs increased by the applicable update factor. *Id.* at 23-24. The Providers further argue that their reimbursements must be based on their reasonable costs under subsection (c)(4)(iii)(A), and not the capped amounts under subsection (c)(4)(ii), because (c)(4)(ii) is "subject to provisions of paragraph (c)(4)(iii)" and the only provision of (c)(4)(iii) in effect after 2002 was subsection (c)(4)(iii)(A). *Id.* at 25 (relying on *Hardy Wilson II*, 616 F.3d at 460).

In opposition, the Agency first explains that beginning October 1, 2003, the BBA scheme described in and time-limited by 42 U.S.C. § 1395ww(b)(3)(H) was no longer in effect. (Agency Br. at 24–36.) The Agency contends that, as it made clear when promulgating 42 C.F.R. § 413.40(c)(4)(iii), subsection (iii) was no longer applicable after the expiration of the BBA caps. *Id.* at 27–28. The Agency further asserts that it then properly looked to 42 C.F.R. § 413.40(c)(4)(ii) to

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

calculate the Providers' post-2002 target amounts. *Id.* at 31–34. Moreover, it contends, the statutory authority for subsection (iii)–42 U.S.C. § 1395ww(b)(3)(H)–was no longer in effect, and the Agency had no authority to continue to follow regulations based on an expired statutory provision. *Id.* at 34–35. The fact that 42 C.F.R. § 413.40(c)(4)(ii) is expressly "[s]ubject to the provisions of [subsection] (c)(4)(iii)" and that subsection did not explicitly include the BBA scheme's expiration date does not somehow extend the life of subsection (c)(4)(iii)(A). *Id.* at 28–29. Subsection (c)(4)(ii) is only "[s]ubject to" (c)(4)(iii) for the period of time for which the latter paragraph could be implemented, which, the Agency claims, was a position it made clear in its rulemaking proceedings, was from fiscal years 1998 to 2002. *Id.* Thus, the Agency concludes, its position that target amounts are based on the previous year's target amount, in accordance with the statute, is not in conflict with the regulations, as the Providers contend, and instead it is fully consistent with the text and purpose of paragraph (c)(4) of the regulations. *Id.* at 29.

We find the Agency's arguments well taken. Its interpretation is entitled to deference because no alternative reading is compelled by the regulation's plain language or by other indications of the Agency's intent at the time of the regulation's promulgation. The Agency, at the expiration of the BBA cap provisions, was faced with a decision: Was it required to continue the implementation of subsection (iii), which was designed specifically to address the cap provisions mandated by Congress, or was the Agency permitted to return to subsection (ii) and logically conclude that subsection (iii) expired with the expiration of the cap provisions? *See Hardy Wilson I*, 2009 U.S. Dist. LEXIS 27819, at *23–24 (posing same question). While it is true that the

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

expiration of subsection (iii) was not bootstrapped to the expiration of the statutory cap provisions, it is reasonable for the Agency to conclude that subsection (iii) had a specific purpose which expired simultaneously with the expiration of the statute that mandated the cap provisions. Indeed, "[w]herever possible, courts should read regulations to be consistent with the statutes that authorize them, and a construction that thwarts the statute which the regulation implements is impermissible." *Progressive Corp. & Subsidiaries v. United States*, 970 F.2d 188, 192–93 (6th Cir. 1992) (<u>Milburn</u>, Norris, Engel) (citations to other circuit courts omitted). With the expiration of subsection (iii), it is reasonable for the Agency to revert to subsection (ii) in the absence of further statutory mandate. No other reading is compelled here. While another reading of the plain language is possible, it certainly is not compelled.

Further, no alternative reading is compelled by other indications of the Agency's intent at the time of the regulation's promulgation. Indeed, the other indications of intent by the Agency at the time of the regulation's promulgation point to the propriety of the Agency's reading. That is, at the time the Agency added subsection (iii), it stated twice that subsection (iii) was only meant to apply for fiscal years 1998 through 2002. The Agency began its discussion of subsection (iii) by stating that "the BBA amended section 1886(b)(3) of the Act to establish caps on the target amounts for excluded hospitals or units for cost reporting periods beginning on or after October 1, 1997 through September 30, 2002." 63 Fed. Reg. at 26,344. The Agency also later stated that it agreed with a commentator who "suggested that § 413.40(c)(4)(iii) of the regulations be modified to clarify that in the case of a psychiatric hospital . . . the target amount for [fiscal years] 1998 through 2002 is

28

*No. 11-1905*
*Michigan Dept. of Community Health, et al.*
*v. Secretary of HHS, et al.*

equal to the lower of . . . [t]he hospital specific target amount . . .; or [t]he 75th percentile of target amounts for hospitals in the same class. . . ." *Id.* The Agency responded that it was "modifying § 413.40(c)(4)(iii) to incorporate this clarification." *Id.*

Even if the Agency's interpretation is considered less convincing than the Providers' interpretation, as indicated *supra*, at the  second step of the *Chevron* analysis, arguing that one interpretation is "better" than another is of no consequence to the Providers. *Hardy Wilson II*, 616 F.3d at 458. Particularly broad deference is warranted when a regulation concerns a complex and highly technical regulatory program such as Medicare reimbursements to psychiatric hosptials. *See Hardy Wilson I*, 2009 U.S. Dist. LEXIS 27819, at \*23 n. 8 (citing *Thomas Jefferson Univ.*, 512 U.S. at 512; *Pauley v. BethEnergy Mines*, Inc., 501 U.S. 680, 697 (1991)). Accordingly, we find that the Agency's interpretation of its regulation is entitled to deference.

## III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment in favor of the Agency and its denial of summary judgment to the Providers.