# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 7, 2015       Decided December 29, 2015

No. 14-5330

WASHINGTON REGIONAL MEDICORP, DOING BUSINESS AS
FAYETTEVILLE CITY HOSPITAL,
APPELLANT

v.

SYLVIA MATHEWS BURWELL, SECRETARY, U.S. DEPARTMENT
OF HEALTH AND HUMAN SERVICES,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00622)

———

*Dan M. Peterson* argued the cause and filed the briefs for appellant.

*Karen A. Schoen*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Vincent H. Cohen, Jr.*, Acting U.S. Attorney General, *Michael S. Raab*, Attorney, *William B. Schultz*, General, Counsel, U.S. Department of Health and Human

Services, *Janice L. Hoffman*, Associate General Counsel, *Susan Maxson Lyons*, Deputy Associate General Counsel for Litigation, and *Bridgette Kaiser*, Attorney. *R. Craig Lawrence* and *Peter C. Pfaffenroth*, Assistant U.S. Attorneys, entered appearances.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Appellant Fayetteville City Hospital is an inpatient psychiatric hospital that provides services to Medicare patients. Fayetteville challenges the method used by the Secretary of Health and Human Services (HHS) to calculate the hospital's reimbursement for services it provided during 2003 and 2004—the two years after statutory caps on reimbursements for psychiatric hospitals expired but before psychiatric hospitals were moved to a prospective-payment system. Because we conclude that HHS's interpretation was not only reasonable but also the best interpretation of the controlling statute, 42 U.S.C. § 1395ww, and regulation, 42 C.F.R. § 413.40, we affirm the decision of the district court denying Fayetteville's motion for summary judgment and granting HHS's cross-motion for summary judgment.

## I. BACKGROUND

### A. Statutory Background

The Center for Medicare and Medicaid Services (CMS)—the component of HHS that administers the Medicare Program—reimburses hospitals for services

provided to Medicare patients. Initially, reimbursement was based on a hospital's reasonable, actual costs. In 1982, concern regarding the rapidly rising costs of Medicare reimbursements prompted Congress to direct the Secretary of HHS to develop a legislative proposal for a prospective-payment system (PPS), whereby hospitals would receive a fixed amount for services rendered. *See* Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, Pub. L. No. 97-248, § 101(b)(3), 96 Stat. 324, 335; *see* S. Rep. No. 97-494, pt. 1, at 24 (1982) ("Hospital spending has been increasing at double-digit rates for over a decade and much faster than the rates of inflation in the economy as a whole. Hospital spending accounts for over 70 percent of Medicare program expenditures . . . ."). In the interim, Congress established limits on the annual rates of increase of a hospital's reimbursable reasonable costs. *See* TEFRA, § 101(a)(1), 96 Stat. at 331-35 (codified at 42 U.S.C. § 1395ww(b)). Pursuant to TEFRA, hospitals were reimbursed for their reasonable costs not exceeding a ceiling based on the hospital's "target amount" for the relevant cost year. 42 U.S.C. § 1395ww(b)(1)(A). For the first year that a hospital reported its costs under TEFRA, the hospital's target amount was equal to "the allowable operating costs of inpatient hospital services . . . for such hospital for the preceding 12-month cost reporting period" plus an applicable percentage increase. *Id.* § 1395ww(b)(3)(A)(i). For all subsequent fiscal years, the target amount was "the target amount for the preceding 12-month cost reporting period" plus an applicable percentage increase. *Id.* § 1395ww(b)(3)(A)(ii).

A PPS was put in place for most hospitals in 1983. *See* Social Security Amendments of 1983, Pub L. No. 98-21, § 601, 97 Stat. 65, 153-62 (codified as amended at 42 U.S.C. § 1395ww(d)). However, Congress chose to exclude certain types of hospitals, including psychiatric hospitals, from the

PPS. *See* Pub L. No. 98-21, § 601(e), 97 Stat. at 153 (codified as amended at 42 U.S.C. § 1395ww(d)(1)(B)). Instead, HHS continued to reimburse these hospitals for their reasonable costs as long as those costs did not exceed the limits set by TEFRA. The calculation of TEFRA limits resulted in "significant variation" in the amount of reimbursement across PPS-exempt hospitals. H.R. Rep. No. 105-149, at 1336 (1997). In an effort to reduce this variation, Congress imposed an additional cap on target amounts for PPS-exempt hospitals for fiscal years 1998-2002. *See* Balanced Budget Act (BBA) of 1997, Pub. L. No. 105-33, § 4414, 111 Stat. 251, 405 (codified as amended at 42 U.S.C. § 1395ww(b)(3)(H)). Under the BBA, target amounts for fiscal years 1998-2002 could not exceed the 75th percentile of target amounts for all hospitals in the same class for cost reporting periods ending during fiscal year 1996, adjusted as applicable for each year of the five year period. *See* 42 U.S.C. § 1395ww(b)(3)(H).

Finally, in 1999, Congress directed the Secretary to develop a PPS for psychiatric hospitals and move the hospitals to that system beginning on or after October 1, 2002. *See* Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act (BBRA) of 1999, Pub. L. No. 106-113, Appendix F, § 124, 113 Stat. 1501, 1501A-332.

**B. Regulatory Background**

After Congress enacted TEFRA in 1982, the Secretary promulgated regulations to implement the act. These regulations mirrored the statutory provisions. Under the regulations, a hospital's target amount for the first cost reporting period after TEFRA's enactment was equal to "the hospital's allowable net inpatient operating costs per case for the hospital's base period increased by the update factor for

the subject period." 42 C.F.R. § 405.463(c)(4)(i) (1982). For all subsequent cost reporting periods, a hospital's target amount was equal to "the hospital's target amount for the previous cost reporting period increased by the update factor for the subject cost reporting period." *Id.* § 405.463(c)(4)(ii); *see also* 47 Fed. Reg. 43,282, 43,292 (Sept. 30, 1982). In 1986, HHS redesignated the relevant sections of 42 C.F.R. Part 405 into new Part 413. *See* 51 Fed. Reg. 34,790 (Sept. 30, 1986).

Following the passage of the BBA, the Secretary amended 42 C.F.R. Part 413 to reflect the new cap scheme. The Secretary made paragraphs (c)(4)(i) and (c)(4)(ii) subject to newly added paragraph (c)(4)(iii). *See* 42 C.F.R. § 413.40(c)(4)(i)-(ii) (2003). Under paragraph (c)(4)(iii), the hospital's target amount was to be "the lower of the amounts specified in paragraph (c)(4)(iii)(A) or (c)(4)(iii)(B) . . . ." *Id.* § 413.40(c)(4)(iii). Paragraph (c)(4)(iii)(A) was a "hospital-specific target amount," which equaled "the net allowable costs in a base period increased by the applicable update factors." *Id.* § 413.40(c)(4)(iii)(A)(I). Paragraph (c)(4)(iii)(B) outlined the BBA cap amount for each year 1998-2002. *Id.* § 413.40(c)(4)(iii)(B).

Finally, in 2005, in response to inquiries from provider hospitals, HHS amended § 413.40(c)(4)(iii) by adding an introductory clause specifying that the paragraph applied only "[f]or cost reporting periods beginning on or after October 1, 1997 through September 30, 2002 . . . ." 70 Fed. Reg. 47,278, 47,464-65, 47,487 (Aug. 12, 2005); *see also* 42 C.F.R. § 413.40(c)(4)(iii) (2005).

## C. Factual and Procedural Background

Although Congress directed HHS to move psychiatric hospitals to a PPS beginning in 2002, HHS was not able to begin the transition until January 1, 2005. *See* 69 Fed. Reg. 66,922, 66,922-24 (Nov. 15, 2004) (explaining that developing a PPS for psychiatric hospitals was more complex and time consuming than for other types of hospitals). In the interim, the Secretary calculated psychiatric hospital target amounts under 42 U.S.C. § 1395ww(b)(3)(A)(ii) and 42 C.F.R. § 413.40(c)(4)(ii). *See* 67 Fed. Reg. 49,982, 50,103 (Aug. 1, 2002). Thus, the 2003 target amount was calculated by adding an applicable percentage increase to the 2002 target amount, which had been subject to the BBA caps, and by extension, the 2004 target amount was calculated by adding an applicable percentage increase to the 2003 target amount. *Id.*

As a psychiatric hospital that provided inpatient services to Medicare patients in 2003 and 2004, Fayetteville's reimbursement depended on how the Secretary calculated its target amounts for those years. Initially, a fiscal intermediary informed Fayetteville that it would be reimbursed based on its hospital-specific target amount under 42 C.F.R. § 413.40(c)(4)(iii)(A). However, the intermediary subsequently revised its calculation and informed Fayetteville that its 2003 and 2004 target amounts would be calculated under 42 C.F.R. § 413.40(c)(4)(ii). The revised calculation resulted in Fayetteville receiving significantly reduced reimbursement for both years. Fayetteville appealed its reimbursements for 2003 and 2004 to the Provider Reimbursement Review Board (PRRB), arguing that the Secretary's method for calculating the 2003 and 2004 target amounts improperly extended the BBA caps past their expiration. The PRRB found that it lacked the authority to

decide the appeal because it involved a challenge to the validity of HHS's regulations, but certified the dispute for expedited judicial review in accordance with 42 U.S.C. § 1395oo(f)(1).

Fayetteville subsequently filed this action in the U.S. District Court for the District of Columbia. Both Fayetteville and HHS filed motions for summary judgment with the district court. Fayetteville argued that HHS's decision to calculate the hospital's 2003 and 2004 target amounts under 42 U.S.C. § 1395ww(b)(3)(A)(ii)—updating its 2002 target amount, which was subject to the BBA cap scheme, by an adjustment factor—impermissibly extended the BBA caps beyond 2002, contrary to the plain language of § 1395ww(b)(3)(H). Pl.'s Mot. Summ. J. at 12. According to Fayetteville, HHS should have calculated its 2003 and 2004 target amounts under 42 C.F.R. § 413.40(c)(4)(iii) and reimbursed Fayetteville based on the hospital-specific target amount, which relies on the net allowable costs for the hospital's base period, not the previous year's target amount. *Id.* at 16. Fayetteville went on to contend that when the Secretary amended paragraph (c)(4)(iii) in 2005 by adding language that explicitly limited the provision's application to October 1, 1997 through September 30, 2002, the Secretary made a substantive change to the regulatory text that amounted to a retroactive revision. *Id.* at 26-29. HHS argued the Secretary's amendment was not a retroactive rule because 42 C.F.R. § 413.40(c)(4)(iii) had never applied beyond 2002, and, therefore, it was inapplicable when calculating the target amounts for 2003 and 2004. Def.'s Mot. Summ. J. at 14, 16. Instead, according to HHS, 42 U.S.C. § 1395ww(b)(3)(A)(ii) unambiguously required HHS to calculate Fayetteville's 2003 target amount by updating the hospital's capped 2002 target amount and, by extension, to calculate the hospital's 2004

target amount by updating the hospital's 2003 target amount. *Id.* at 10-11.

The district court denied Fayetteville's motion for summary judgment and granted HHS's cross-motion for summary judgment. *See Wash. Reg'l Medicorp v. Burwell*, 72 F. Supp. 3d 159, 160 (D.D.C. 2014). Applying *Chevron*, the court found that the relevant provisions of the Medicare statute unambiguously required the Secretary to calculate the reimbursement as she had. *Id.* at 164-65. In the alternative, the court found that, even if the statute was ambiguous, the Secretary's method was a reasonable interpretation of the statute and its implementing regulations. *Id.* at 165-67. The district court also found that the 2005 amendment to 42 C.F.R. § 413.40(c)(4)(iii) was not an improper retroactive change because HHS did not alter its method of calculating target amounts when it made the amendment. *Id.* at 167-68.

## II. DISCUSSION

Fayetteville has timely appealed the district court's decision granting HHS's cross-motion for summary judgment. *See* 42 U.S.C. § 1395oo(f)(1) ("Providers shall . . . have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines . . . that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received."). We review a district court's grant of summary judgment *de novo*. *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008). Here, the material facts are not in dispute. Therefore, we proceed to determine whether HHS was "entitled to [summary] judgment as a matter of law." Fed. R. Civ. P. 56(a). Under *de novo* review, we "may affirm

on a different theory than that relied upon by the district court." *McCormick v. District of Columbia*, 752 F.3d 980, 986 (D.C. Cir. 2014).

## A. The Statute

In examining HHS's interpretation of the statute, this Court applies the familiar two-pronged test set forth in *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." *Id.* at 842. First, the court must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. We also note that "[t]he Supreme Court has made clear that courts must give heightened deference to [an agency's] interpretation of a 'complex and highly technical regulatory program' such as Medicare." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). We agree with HHS that Fayetteville's 2003 and 2004 target amounts are properly calculated under 42 U.S.C. § 1395ww(b)(3)(A)(ii). Insofar as there is any ambiguity in the statute, we would uphold HHS's interpretation with or without *Chevron* deference because HHS's interpretation is not only reasonable but also the best interpretation of the statute.

When Congress passed the BBRA, it provided that the PPS for psychiatric hospitals would be implemented

immediately after the expiration of the BBA caps. *See* 42 U.S.C. § 1395ww(b)(3)(H)(i) (imposing caps for fiscal years 1998-2002); BBRA, Pub. L. No. 106-113, Appendix F, § 124(c), 113 Stat. at 1501A-332 (directing the Secretary to move psychiatric hospitals to a PPS "beginning on or after October 1, 2002"). Congress did not anticipate the gap between the two systems of reimbursement and, therefore, did not directly speak to how HHS should calculate target amounts during that gap. Thus, HHS was left to interpret § 1395ww with little direction. We agree with HHS that, under the best interpretation of the statute, Fayetteville's 2003 target amount is properly calculated under 42 U.S.C. § 1395ww(b)(3)(A)(ii) by adding an applicable percentage increase to the hospital's 2002 target amount, even if that target amount was capped by § 1395ww(b)(3)(H). By extension, we also agree that Fayetteville's 2004 target amount was properly calculated by adding an applicable percentage increase to the 2003 target amount.

Two provisions of § 1395ww are relevant for calculating Fayetteville's 2003 target amount: paragraph (b)(3)(A) and paragraph (b)(3)(H). Paragraph (b)(3)(A) sets out how to calculate a psychiatric hospital's target amount for its first cost reporting period, *see* 42 U.S.C. § 1395ww(b)(3)(A)(i), and for all subsequent cost reporting periods, *see id.* § 1395ww(b)(3)(A)(ii). Only the latter method applies here because 2003 was not Fayetteville's first cost reporting period. Under § 1395ww(b)(3)(A)(ii), a psychiatric hospital's target amount equals "the target amount for the preceding 12-month cost reporting period, increased by the applicable percentage increase . . . ." For 2003, the preceding 12-month cost reporting period is 2002. Pursuant to § 1395ww(b)(3)(H), the target amount for 2002 "may not exceed" the "75th percentile of the target amounts for such hospitals within such class for cost reporting periods during fiscal year 1996," as

updated by "a factor equal to the market basket percentage increase." *Id.* § 1395ww(b)(3)(H)(i), (ii)(I), (III). The most straightforward reading of these provisions instructs HHS to use the capped 2002 target amount to calculate the 2003 target amount under § 1395ww(b)(3)(A)(ii).

Fayetteville argues that this method of calculating a psychiatric hospital's 2003 and 2004 target amounts is contrary to the statute because it effectively extends the BBA caps beyond 2002, and Congress plainly did not intend for the Secretary to take a cap that was explicitly limited to five years and extend it to cover seven years. We disagree.

A BBA cap was not imposed on the 2003 or 2004 target amount. Only the 2002 target amount was capped. As the district court noted, "[t]here is no doubt that reverting to the pre-BBA method of calculating reimbursement perpetuated the effect of the BBA caps." *Wash. Reg'l Medicorp*, 72 F. Supp. 3d at 164. But, as other circuits have noted, this "echo effect" is not contrary to the statute. *See Mich. Dep't of Cmty. Health v. Sec'y of Health & Human Servs.*, 496 F. App'x 526, 536 (6th Cir. 2012); *Ancora Psychiatric Hosp. v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 417 F. App'x 171, 175-76 (3d Cir. 2011). That a cap imposed on one cost reporting period might affect the subsequent cost reporting period is unsurprising given that TEFRA, which was neither repealed nor replaced by the BBA or the BBRA, established a system in which a psychiatric hospital's target amount could only increase by a certain percentage each cost reporting period. *See* 42 U.S.C. § 1395ww(b)(3)(A); *see also Ancora Psychiatric Hosp.*, 417 F. App'x at 176.

Moreover, using § 1395ww(b)(3)(A)(ii) to calculate the target amounts for 2003 and 2004 is consistent with Congress's "progressive effort" to move hospitals from an

actual cost reimbursement system to a system "based on objective patient characteristics and consistent national standards, and to rein in disproportionately expensive treatment provided by certain hospitals." *Mich. Dep't of Cmty. Health*, 496 F. App'x at 534; *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. Sebelius*, 650 F.3d 685, 687 (D.C. Cir. 2011) ("Congress has repeatedly attempted to slow the increase in Medicare costs for hospitals' inpatient services."). There is no indication that Congress intended to reverse this trend and have HHS go back to calculating target amounts by simply increasing the hospital's reasonable, actual costs from the base year.

We conclude that the best interpretation of 42 U.S.C. § 1395ww, which is the interpretation adopted by HHS, provides for the calculation of Fayetteville's 2003 and 2004 target amounts using § 1395ww(b)(3)(A)(ii).

**B. The Regulation**

According to Fayetteville, calculating the 2003 and 2004 target amounts based on the 2002 capped target amount also ran afoul of the Secretary's own regulations. Fayetteville argues that 42 C.F.R. § 413.40(c)(4)(iii) was still in effect during 2003 and 2004 and required HHS to reimburse Fayetteville for both years using the hospital-specific target amount under subparagraph (A). Nothing in § 413.40 compels this Court to adopt Fayetteville's reading. With or without deference, we conclude that HHS's interpretation is the better one, not least of all because it is consistent with the best reading of the statute. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

As relevant here, the regulation states that, "[s]ubject to the provisions of paragraph (c)(4)(iii) of this section, for []

cost reporting periods [after the initial period], the target amount equals the hospital's target amount for the previous cost reporting period increased by the update factor for the subject cost reporting period . . . ." 42 C.F.R. §§ 413.40(c)(4)(ii). We agree with HHS that paragraph (c)(4)(iii) was added to implement the BBA caps and is best read as only applying from 1998-2002, when the BBA caps were in effect. *See* 62 Fed. Reg. 45,966, 45,969, 46,018-19 (Aug. 29, 1997) (rule is implementing, among other provisions of the BBA, the caps on target amounts for psychiatric hospitals by amending § 413.40(c)(4)); 63 Fed. Reg. 26,318, 26,344, 26,358 (May 12, 1998) (opening discussion of modifications to § 413.40(c) with an explanation of the BBA caps). Therefore, the "subject to" clause of paragraph (c)(4)(ii) had no effect in 2003 and 2004, and the target amounts for those years are properly calculated by updating the previous year's target amount.[1]

The conclusion that paragraph (c)(4)(iii) does not apply after 2002 is consistent with the fact that the regulatory preambles cited by both parties, which discuss how target amounts for 2003 and subsequent cost years would be calculated under § 413.40, refer only to paragraph (c)(4)(ii) and do not mention (c)(4)(iii) at all. *See* 67 Fed. Reg. 49,982, 50,103-04 (Aug. 1, 2002) ("In accordance with existing §§ 413.40(c)(4)(ii) . . . [psychiatric hospitals will] continue to be paid on a reasonable cost basis, and payments are based on their Medicare inpatient operating costs, not to exceed the ceiling. The ceiling will be computed using the hospital's . . .

---

[1] We recognize that the 5th Circuit has reached the opposite conclusion. *See Hardy Wilson Mem'l Hosp. v. Sebelius*, 616 F.3d 449, 457-61 (5th Cir. 2010) (42 C.F.R. § 413.40 unambiguously required HHS to calculate target amounts in the gap period under paragraph (c)(4)(iii)(A) because only subparagraph (B) no longer applied after 2002).

target amount from the previous cost reporting period updated by the [applicable] rate-of-increase . . . ."); 67 Fed. Reg. 31,404, 31,491 (May 9, 2002) (same).

Fayetteville further contends that using § 413.40(c)(4)(ii) to calculate the 2003 and 2004 target amounts is inconsistent with the general and somewhat ambiguous definition of target amount provided by § 413.40(a)(3): "Target amount is the per discharge (case) limitation, derived from the hospital's allowable net Medicare inpatient operating costs in the hospital's base year, and updated for each subsequent hospital cost reporting period by the appropriate annual rate-of-increase percentage." 42 C.F.R. § 413.40(a)(3). According to Fayetteville, because HHS's target amount for 2003 was based on the capped 2002 target amount, the target amounts for both 2003 and 2004 are not "derived from" the hospital's reasonable operating costs. Fayetteville's position appears to be that the regulatory definition requires a hospital's target amount to be its reasonable operating costs from its base year plus an update factor. But, saying that the target amount is "derived from" the hospital's base year reasonable operating costs is not the same as saying that the target amount "is" the hospital's base year reasonable operating costs. Even the target amounts for a psychiatric hospital during the BBA capped years were derived from the hospital's reasonable operating costs in the base year. *See* 42 U.S.C. § 1395ww(b)(3)(A), (H) (target amount equals "allowable operating costs" plus applicable increases unless that sum exceeds the 75th percentile cap for the cost reporting year); 42 C.F.R. § 413.40(c)(4)(iii) (target amount equals "net allowable costs in a base period" plus update factors unless that sum exceeds the 75th percentile cap for the cost reporting year). The cap simply meant that the hospital's Medicare reimbursements would not necessarily cover all the reasonable operating costs the hospital incurred. Thus, there

is no conflict between the definition in § 413.40(a)(3) and the method of calculation employed by HHS.

Finally, because § 413.40(c)(4)(iii), as it existed in 2003 and 2004, is best read as applying only from 1998-2002 and HHS has consistently adhered to this interpretation, we conclude that the 2005 amendment, which simply clarifies this temporal limit, was not a substantive change to the rule and therefore does not present a retroactivity problem. *See Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 13-14 (D.C. Cir. 2011) ("To determine whether a rule is impermissibly retroactive, we first look to see whether it effects a substantive change from the agency's prior regulation or practice." (citation and internal quotation marks omitted)).

## III. CONCLUSION

For the reasons set forth above, the district court's decision denying Fayetteville's motion for summary judgement and granting HHS's cross-motion for summary judgment is affirmed.

*So ordered.*